F I L E D
Clerk
District Court
APR 12 2019
for the Northern Mariana Islands
By_____
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> Plaintiff/Appellee, <br><br> v. <br><br> **MUKSEDUR RAHMAN,** <br><br> Defendant/Appellant. | Case No. 1:17-CR-00001 <br> (Related to 9th Cir. Case No. 18-10311) <br><br> **DECISION AND ORDER FINDING THAT DEFENDANT/APPELLANT DID NOT DELIVER NOTICE OF APPEAL TO SAIPAN PRISON AUTHORITIES** |

## I.   INTRODUCTION

This matter has been remanded to this Court by the United States Court of Appeals for the Ninth Circuit for the limited purpose of conducting fact-finding "as to whether appellant delivered a notice of appeal to prison authorities in Saipan prior to his April 14, 2018 transfer to California." (Order, Feb. 25, 2019, No. 18-10311, Dkt. Entry 13.) The finding is material to whether Defendant/Appellant Muksedur Rahman filed notice of appeal within 14 days after entry of judgment on March 16, 2018 or amended judgment on April 10, 2018. *See* Fed. R. App. R. 4(b)(1)(A).

For the reasons stated herein, the Court finds that notice of appeal was not delivered to prison authorities in Saipan prior to Defendant/Appellant Muksedur Rahman's transfer to California.

## II.   PROCEDURAL HISTORY

The Court received the Ninth Circuit's remand order on February 26, 2019 (ECF No. 379.) On March 12, the Court held a status conference to discuss procedure for the fact-finding with

Assistant U.S. Attorney Eric O'Malley and Rahman's CJA counsel, Robert T. Torres, so as to provide for Rahman to appear at future hearings by telephone from federal prison in California (CI Taft) with the aid of an interpreter, and to arrange for telephone conferences between Rahman and counsel. (*See* Minute Order, ECF No. 382, and Minute Entry, ECF No. 383.) Follow-up status conferences were held on March 19 (*see* Minute Entry, ECF No. 384) and March 21 (*see* Minute Entry, ECF No. 386). At the March 21 hearing, Rahman appeared by telephone with the aid of an interpreter. On March 22, a writ of habeas corpus ad testificandum issued to bring Rahman to the federal courthouse in Bakersfield to appear via video teleconference at an evidentiary hearing set for April 2 in Saipan (April 1 in California).

On April 2, 2019, the Court held an evidentiary hearing. (*See* Minute Entry, ECF No. 387.) Rahman appeared via video teleconference from Bakersfield, assisted by a Bengali interpreter. The defense called two witnesses: Rahman himself and Joaquin Sablan, Jr., a corrections officer at the CNMI Department of Corrections ("DOC") in Saipan. Three defense exhibits were admitted: a DOC telephone logsheet for March 19–April 12, 2018 (Exh. A), a shift logbook (Exh. B), and a sample envelope addressed by an inmate to a judge of the CNMI Superior Court (Exh. C).

### III.  LEGAL STANDARD

"A timely notice of appeal is a non-waivable jurisdictional requirement." *Stephanie-Cardona LLC v. Smith's Food and Drug Centers, Inc.,* 476 F.3d 701, 703 (9th Cir. 2007). Appellant bears the burden of proof by a preponderance of the evidence. *United States v. Uribe-Bautista,* 2016 WL 2996896, at *1 (N.D. Cal. May 25, 2016) ("the burden falls to Uribe-Bautista to prove by preponderance of the evidence that he requested Mitchell file a notice of appeal."); *United States v. Mejia,* 2015 WL 13722914, *2 (C.D. Cal. Feb. 27, 2015) ("Defendant failed to meet his burden to show by a preponderance of the evidence that his Notice of Appeal was timely filed.").

### IV. THE EVIDENCE

A. <u>Rahman's Testimony</u>

On March 9, 2018, the Court sentenced Rahman to serve 48 months in prison after his conviction by a jury on two counts of mail fraud and three counts of fraud in foreign labor contracting. (Minute Entry, Mar. 9, 2018, ECF No. 312; Judgment, Mar. 16, 2018, ECF No. 313; Amended Judgment, Apr. 9, 2018, ECF No. 342.) Rahman, who had been on pretrial release, was permitted to remain out of custody pending notification from the U.S. Marshal to self-surrender. (Minute Entry at 7.) At his attorney Robert Torres's office, he and Torres discussed whether to appeal his conviction and sentence. (Transcript of April 2, 2019 hearing, ECF No. 388, 10:19–22.) On March 11, Rahman self-surrendered at Saipan DOC. (Tr. 22:17–21.) At the evidentiary hearing, Rahman testified that once in custody at DOC, he changed his mind and decided to pursue an appeal. (Tr. 10:22–11:1.) He prepared a notice of appeal ("NOA") in Saipan DOC sometime between March 14 and March 16 with the assistance of another inmate. (Tr. 8:5–15.) He is confident of the time frame because he recalls he submitted the letter within a few days of his self-surrender. (Tr. 22:13–21.) Rahman did not tell Torres of his intention to pursue an appeal. (Tr. 8:16–18.)

As to how he came to change his mind about an appeal, Rahman testified as follows:

> After I went to DOC, maybe about after one or two days later, I was sitting in an upset mind, and then one local asked me, what is your problem, why did you come here. After that I have given him the entire picture of the case, and after that, then he told me that you have a good case, you could have appealed. And he asked me why your attorney did not file for an appeal.
> Then at that point, the local, he said he would help me and I did not notify my attorney. And I was told that once this paper will be received by the court, they will provide me a new attorney. I did not notify my attorney because he may be angry or upset with me. That's why I did not.

(Tr. 11:5–16.)

Rahman identified the "local" as Chamorro, because he heard him speaking to another inmate in Chamorro, but he could not remember the man's name. (Tr. 12:3–14.) Rahman met with him two or three times. (Tr. 12:19–22.) The first meeting was 30–40 minutes long, the others just a few minutes long. (Tr. 12:25–13:1.) The two men communicated mainly in English. (Tr. 13:19–23.) They lived in the same unit – Rahman on the upper level, the man on the lower level. (Tr. 14:3–7.). Rahman thinks the man who helped him is no longer alive, that he passed away in DOC in either the last week of March or the first week of April, 2018. (Tr. 14:8–17.) During direct examination, Torres suggested a full name and a nickname, but Rahman did not recognize them. (Tr. 14:18–25.) The only physical description of the man Rahman was able to give is that he was between 55 and 60 years of age and had short hair and no beard. (Tr. 14:25–15:1; 31:10–18.) Rahman testified that no other inmates and no DOC officers overheard them talking. (Tr. 15: 2–11.)

Rahman testified that he gave the NOA to a DOC officer to send to this District Court. (Tr. 9:24–10:2.) According to Rahman, at their last meeting the inmate who helped him gave him a handwritten one-page paper to sign, then folded it into an envelope and told Rahman to hand it over to an officer. (Tr. 15:17–22.) Rahman did not read the paper, and the man did not read it to him. (Tr. 16:8–11.) He did see, however, that his own name was on the envelope and it was addressed to the District Court. (Tr. 19:1–20.) He brought it to an officer who was seated behind a desk watching the area where the two men met. (Tr. 20:7–17.) The officer told him to put it on the desk. (Tr. 23:2–6.) Rahman understood that the officer would help him send the letter. (Tr. 23:7–10.) Rahman does not remember the officer's name. (Tr. 20:18–20.) He never followed up with the officer to make sure the envelope was sent. (Tr. 20:9–13.)

4

Torres questioned Rahman about telephone calls from DOC. Rahman testified that when he called Torres on April 9 to complain about not getting his diabetes medication, he did not mention the NOA. (Tr. 17:3–13.) He testified that while in DOC he did not mention the NOA to anyone on the outside with whom he talked on the phone, including some friends and his wife. (Tr. 17:14–18:8.) On cross-examination, he admitted he did not discuss it even with his brother Mohammad Rafiqul Islam, who was also convicted of mail fraud and has pursued an appeal. (Tr. 27:21–28:5.) Torres asked him why, and he gave somewhat cryptic answers that suggest he feared repercussions: "I did not notify anybody about that because after they received my paper, they may give me a new attorney or an old attorney. I don't know what they will do, that's why I didn't tell anybody." (Tr. 17:20–23.) "I don't know what would be the outcome of the appeal. And in case if I tell it to anyone, if that goes to Saipan, and I don't know that information will take which route. That's the reason I didn't tell anybody." (Tr. 18:10–13.) "I did not notify anybody because in Saipan, they make stories, small one to a big one, so I was waiting for the result." (Tr. 18:16–18.)

On cross-examination by the prosecutor, Rahman went into more detail about why he took the inmate's advice to file an appeal when his attorney had counseled him not to:

> Q   The local who was assisting you at the Department of Corrections here, you said that he listened to your story and he said you have a good case, is that correct?
> A   Yes.
> Q   What did he tell you was good about your case that you could appeal?
> A   When I explained him about that I didn't know, I just wanted to help. The person who did this job was somebody else, and I just help them and that it will constitute such help – such help will constitute the mail fraud, et cetera, I had no understanding about that. When I told this, then he told me.
> Q   And his response was, it sounds like you have a good case for appeal?
> A   Yes, by good case, he means that yes, you can appeal.
> Q   Did he say that he was a lawyer?
> A   No.
> Q   It sounds like he has some legal expertise, wouldn't you agree?

5

1         A   Yes, he did tell and I agreed with him.
      Q   What did he tell you about his legal knowledge, his legal expertise?
      A   Yes, he told me that if I file this appeal after – the Court will either give me a new attorney or the Court may decide give the old attorney. And then when he saying that I believed him and I filed the appeal.
      Q   So, at this point, you trust this inmate at the Department of Corrections more than you trust Mr. Torres?
      A   I did not ask for his help or I did not notify him because I was not happy with him because he didn't advise me that I should have done appeal from outside.
      Q   I'm sorry, I'm confused about it. Who is saying that? Who are you referring to?
      A   Yes, I mean, when I was outside, if my attorney wished, he could have filed the appeal, but he did not. So, I did not tell him.

(Tr. 25:16–26:25.)

The Court questioned Rahman about the circumstances under which he met with the inmate who helped him. The first, 30–40 minute conversation was in the other inmate's unit; the man sat on a bed, and Rahman sat in a chair. (Tr. 30:3–4.) The subsequent, shorter meetings took place in a recreation area with a basketball court to which the inmates had access one hour each day. (Tr. 29:9–11, 30:8–11.) The man would not play basketball but would sit in a plastic chair and Rahman would go up and talk to him. (Tr. 30:18–24.)

Around April 13, Rahman was moved from DOC to a Bureau of Prisons facility in San Bernardino, California, and then transferred to CI Taft on May 25. (Tr. 8:19–9:2.) After discussion with another Taft inmate, Rahman checked on the status of his appeal with the Clerk of the NMI District Court. (Tr. 9:3–9.) Around July 23, he received a response from the Clerk that no NOA had been filed and there was no record of an appeal. (Tr. 9:10–19.)

//

//

//

6

B. <u>Lieutenant Sablan's Testimony</u>

Torres called to the stand Lieutenant Joaquin Sablan, a corrections officer at DOC. Lieutenant Sablan testified that he is a classifications officer responsible for handling all inmate records except medical records. (Tr. 34:11–19.)

According to Lieutenant Sablan, an inmate can call his attorney or a family member to pick up mail from him, or he can give it to an officer who passes it along to the commanders or the administration, i.e., the front desk. (Tr. 35:23–36:1, 39:20–40:1.) Rahman's testimony that he left the mail on the officer's desk is consistent with DOC procedure. (Tr. 37:7–11, 19–21.) After receiving the letter, the officer logs that he or she has received it from the inmate. (Tr. 37:13–14.) The administration sends the envelope to the clerk of court, and a photocopy showing receipt by the clerk goes in the inmate's record or jacket. (Tr. 36:1–5, 42:13–24.)

Torres elicited the following testimony about the details of the procedure:

> Q  . . . as part of this entry or logging in, does any DOC officer on receipt of that envelope actually write anything on it, like, received and their name or initial and date?
> A  They would write down that they receive it and then they would right down that they relinquish it to a certain person so they would have, like, a change of where that letter went to.
> Q  So, from administration after photocopying, that envelope from an inmate is then to go to Superior Court or District Court or wherever it's supposed to go, is that correct?
> A  Yes.
> Q  And then upon delivery either the District Court stamps that or signs receipt for that and then what happens to that stamped?
> A  It's brought over to my office or we file it in their files.
> Q  So that reflects that that was received and delivered, correct?
> A  Yes, sir.

(Tr. 42:6–24.)

Lieutenant Sablan stated that in preparation for the hearing he retrieved and examined Rahman's inmate file and the log books from the pod where he was housed. (Tr. 35:1–5.) He

7

testified that he searched for Rahman's name in the logs for the relevant dates and did not find any entry that related to Rahman. (Tr. 39:10–17.) He checked in Rahman's file and did not find a photocopy of an envelope there. (Tr. 40:18–24.) He testified that it is highly unlikely that the absence of a record is because of an oversight by DOC, because officers take the handling of court documents and appeal papers very seriously. (Tr. 41:11–19.)

In support of Lieutenant Sablan's testimony, Torres introduced three exhibits. Exhibit A (ECF No. 387-2) is Rahman's DOC telephone logsheet from March 19 to April 12, 2018 showing all outgoing calls. (Tr. 45:2–20.) Outgoing calls are logged by means of each inmate's unique PIN number. (Tr. 45:21–46:1.) The logsheet showed a call to Torres's cell phone number on April 9, 2018. (Tr. 48:5–17.)[1] Exhibit B (ECF No. 387-3) comprises 18 logbook pages, written in several different hands, for Rahman's Pod 2 during the period in question. (Tr. 49:19–50:8.) Lieutenant Sablan examined this logbook and another logbook, not offered into evidence, which covered main control and Rahman's section of Pod 2. (Tr. 50:9–20.) Lieutenant Sablan did not find any entry involving Rahman and an envelope. (Tr. 50:21–51:2.)

As an example of how DOC handles court mail received from inmates, Lieutenant Sablan referred to Exhibit C (ECF No. 387-4), a photocopy of an envelope from a DOC inmate in Pod 2 to a judge of the CNMI Superior Court. (Tr. 52:19–24.) The letter is not contemporaneous with Rahman's stay in DOC but is from about a year later – marked in the bottom righthand corner "received" on March 18, 2019. Lieutenant Sablan did not find any letters from Rahman's time in 2018. (Tr. 53:13–18.) The phrase "ready filed" in the upper lefthand corner means, according to Lieutenant Sablan, that it was filed in the inmate's jacket. (Tr. 53:5–12.)

---

[1] On this point, Torres himself effectively testified. "Q[:] My whole point here is that – you see that [telephone number], Mr. Sablan? A[:] Yes, sir. Q[:] That would be my cell phone number indicating a call on April 9th by Mr. Rahman to me? A[:] Yes." It was not established that Lieutenant Sablan has personal knowledge of Torres's cell phone number, and the logsheet does not identify the person to whom the number is assigned.

1  In the course of investigating Rahman's claim, Lieutenant Sablan spoke with other DOC
2  officers who were assigned to Rahman's pod and section, and none of them recalled an envelope
3  from Rahman. (Tr. 54:18–55: 11.)

4  With respect to Rahman's testimony about the inmate who prepared the NOA, Lieutenant
5  Sablan recalled that an inmate in his fifties died of cancer around April 2018. (Tr. 55:12–23.) In
6  particular, he stated: "When he [Rahman] say that that inmate passed away from cancer, yes, I
7  remember that inmate." (Tr. 55:18–19.) A review of the transcript shows that Rahman did not say
8  what the inmate who helped him died from.

9  The inmate who died from cancer in April 2018 was named Jose Allen Santos. (Tr. 56:2–
10 3.) After he was diagnosed with cancer in January 2018, Santos was bedridden most of the time.
11 (Tr. 56:12–16; 57:18–20.) Santos lived on the lower level of Pod 2, Section B, the same pod and
12 section as Rahman. (Tr. 57:1, 7–9.) This was an open area with bunks everywhere. (Tr. 57:1–3.)
13 Santos needed assistance to use the restroom and was wearing adult diapers. (Tr. 57:10–14.) Santos
14 was the only inmate who passed away during the period in question. (Tr. 57:23–58:2.)

15 At the end of the examination, Torres asked Lieutenant Sablan whether there was anything
16 else he could share with the Court to shed light on the issue. (Tr. 58:9–13.) Lieutenant Sablan
17 responded:

> We went through the logs from the visitors, even from his visitation or the telephone log sheet – log books. We even go as far as checking the main control or checking our administration if they miss anything – like, if they mistakenly left it somewhere – and we couldn't find anything. We – I exhausted everything that I could do to provide any evidence to prove Rahman's claim . . . but I couldn't find any.

(Tr. 58:14–22.)

Neither the prosecutor nor the Court had any questions for the officer.

9

## V. DISCUSSION

The determination of whether Rahman delivered a notice of appeal to DOC officers turns entirely on Rahman's credibility. Yet not one shred of evidence corroborates his story. On a matter of such importance as the appeal of his criminal conviction and sentence, he kept mum. Perhaps one can understand why he would not have mentioned the NOA to his attorney, whose advice he was casting aside. But why did he not tell a single friend, a single family member, a single corrections officer, or any fellow inmate? There is nothing about Rahman's criminal case or about criminal appeals in general that suggests Rahman would have been in danger if he had disclosed his change of mind to others within or outside DOC. Indeed, according to him, he discussed filing an appeal with the other inmate several times in an open recreation area. After supposedly handing the NOA to the officer, he did not call the district court even once during the month he remained on Saipan to ensure that the document had been received. As important as an appeal is, he took no action whatsoever to make certain that his appeal was secure and to create some sort of record, independent of DOC's own records, that the NOA existed. Arrayed against Rahman's word alone is a credible investigation by DOC into the paper trail that might have corroborated his story. On this record, Rahman has not met his burden to show that he delivered a NOA to Saipan correctional authorities.

As to the identity of the inmate who allegedly helped Rahman, that inquiry is a red herring. The fact that an inmate who in many respects fits Rahman's description of his helper is no longer alive to confirm or deny his story is unfortunate, but it does not make his story any more or less likely to be true. Even if there were evidence (and there is not) that Jose Santos was a jailhouse lawyer, it would not go to show that he had helped Rahman. Most important, even if Santos did help Rahman, it would not show that Rahman turned a NOA into DOC authorities. It is entirely

possible that an inmate helped Rahman prepare a NOA, but then Rahman had another change of mind and decided to follow Torres's advice and not appeal. Much later, when Rahman found out his brother and other codefendants had appealed, he may have felt remorse and is now insisting he went ahead with the appeal. What actually happened cannot be known. What is known, however, is that Rahman has nothing to back up his claim.

## VI. CONCLUSION

On the record developed at the April 2nd evidentiary hearing, the Court finds that Muksedur Rahman did not deliver a notice of appeal to Saipan prison authorities.

The Clerk is directed to serve a copy of this decision on the Court of Appeals for the Ninth Circuit.

IT IS SO ORDERED this 12th day of April, 2019.

_____
RAMONA V. MANGLONA
Chief Judge